**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **DONALD A. CHIUSA, JR.,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No.**_____ |
| **v.** ) | |
| ) | **COMPLAINT FOR TRADEMARK** |
| **FRED STUBENRAUCH, COPPER** ) | **INFRINGEMENT and COPYRIGHT** |
| **VENTURES, LLC, and BASIC** ) | **INFRINGEMENT** |
| **COPPER INC.** ) | |
| ) | **JURY DEMAND** |
| **Defendants.** ) | |
| ) | |

**COMPLAINT**

Plaintiff Donald A. Chiusa, Jr. ("Plaintiff"), by his attorney and for his Complaint against

Fred Stubenrauch ("Defendant") and Copper Ventures, LLC ("CV"), and Basic Copper, Inc.

("BC") (together, all defendants are referred to hereafter as "Defendants"), alleges, upon

knowledge as to his own acts and upon information and belief as to the acts of others, as follows:

**PARTIES**

**Plaintiff**

1.       Plaintiff Chiusa is an individual residing at 5016 Spedale Court, No. 310, Spring

Hill, Tennessee 37174.

2.       Plaintiff is, and at all times relevant, was, and continues to be, engaged in, among

other things, the business of creating commercial websites and selling various products for

manufacturers ranging from copper fixtures to epoxy sealants.

1

3.     Plaintiff is the owner of the registered trademark COLOR COPPER.COM (Registration No. 6247189) (the "Mark" or the "Trade Name") (see Exhibit A).  The Mark was registered in the United States Patent and Trademark Office on January 12, 2021, having Trademark Serial No. 88756520.

4.     Plaintiff created both the https://www.colorcopper.com (the "Plaintiff's Website") and https://www.bestbartopepoxy.com (the "Plaintiff's Ancillary Website") websites (collectively, "Plaintiff's Websites"), as well as a color brochure for use in marketing and sales ("Plaintiff's Brochure").

5.     Plaintiff registered text, photographs, and artwork for Plaintiff's Brochure on June 17, 2021, having Registration Number Registration Number TX 8-977-192 (Copyright 1) (See Exhibit B).  Copyright 1 has an initial date of first publication of December 12, 2013.

6.     Plaintiff registered new and revised text and photographs for Plaintiff's Brochure and for his website on May 28, 2021 with the Copyright Office, having Registration Number TX 8-973-419 ("Copyright 2") (see Exhibit C), with new material added and registered on November 11, 2018.

7.     Plaintiff registered text, photographs, and artwork for Plaintiff's Ancillary Website on May 3, 2021 with the Copyright Office, having Registration Number TX 8-973-291 (since this registration is for Plaintiff's Ancillary Website, it will be referred to as "Copyright A") (See Exhibit D).  Copyright A has a date of first publication of April 17, 2019.

8.     Copyrights 1, 2 and A all used the Plaintiff's Mark.

9.     Plaintiff is the sole member of Color Copper, LLC, and UltraClear Epoxy, LLC.

**Defendants**

10.     Defendant Stubenrauch is an individual residing at 6207 North Calle Minera, Tucson, Arizona 85718.

11.     Defendant CV is a Missouri limited liability company in the business of producing and selling aged copper for use as fixtures in homes.  CV can be served via its registered agent, Levy Craig, at 4520 Main Street, Suite 1600, Kansas City, Missouri 64111.

12.     Defendant is the controlling member of CV.

13.     CV created, operates, and maintains the websites https://www.coloredcopper.com (the "Infringing CV Website") and https://www.duraclearepoxy.com (the "Infringing Epoxy Website") (collectively, "CV Websites").

14.     BC is an Illinois corporation is in the business of producing and selling aged copper for use as fixtures in homes.  BC can be served via its registered agent, Arthur Kunz, Jr. at 1606 Briarcreek Lane, Springfield, Illinois 62711.

15.     BC created, operates, and maintains the website https://www.basiccopper.com (the "Infringing BC Website").  Collectively, the CV Websites and the Infringing BC Website shall be referred to as the "Defendants' Infringing Websites").

**JURISDICTION AND VENUE**

16.     The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1338(a) in that the controversy arises under the Lanham Act (15 U.S.C. §§ 1051 *et seq.*) and the Copyright Act and Copyright Revision Act of 1976 (17 U.S.C. §§ 101 *et seq.*), which is within the exclusive jurisdiction of federal courts pursuant to 28 U.S.C. § 1331.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(a).

18.     Personal jurisdiction over Defendants is proper in this jurisdiction on the grounds that, among other reasons, Defendants, Defendants' agents, and/or Defendants' personal representatives maintain regular and systematic activities in Tennessee by regularly entering into contracts to be performed in Tennessee, including contracts related to this action, and with respect to CV's Websites, purposefully maintaining active, as opposed to passive, websites capable of being viewed in Tennessee and interacted with systematically and regularly by Tennessee residents, so that citizens of Tennessee have seen and been exposed to such websites on a regular basis in or before 2020.  Additionally, acting directly or indirectly, Defendants have transacted business in Tennessee by supplying services, materials, and samples to Plaintiff necessary for sale and distribution of copper and/or epoxy products every three to four weeks since 2010, caused tortious injury by an act or omission outside this state of a person who regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or serviced rendered, in Tennessee. Service of process on the Defendants without an address in Tennessee or without an agent for service of process in Tennessee is pursuant to the Tennessee long arm statute.

## **FACTUAL ALLEGATIONS**

19.     This action for trademark and copyright infringement arises from Defendants' infringement of Plaintiff's exclusive rights to the Mark and in Copyrights 1, 2 and A, including without limitation the copyrighted pictures, images, text, artwork, embodied therein (the "Works"), all of which were either created, taken, or bought by, or assigned to, Plaintiff.

20.     Plaintiff and Defendant began business interactions in the early 2010's.  Defendant was and continues to be in the business of creating residential fixtures and décor made from aged

4

and/or etched copper. Defendant approached Plaintiff and asked Plaintiff to create a website to help sell his copper lampshades and mirrors. Plaintiff agreed and created the Defendant-requested website.

21.     Plaintiff asked Defendant if he could create his own website and market the copper sheets to a new industry for copper countertops, bar tops and kitchen backsplash. Defendant agreed and the Plaintiff created Plaintiff's Website.

22.     In furtherance of the new distributorship, Plaintiff began utilizing the fanciful trade name COLOR COPPER.COM in commerce on February 16, 2010. The Mark has been continually used by Plaintiff since that time.

23.     The Plaintiff's Website consists of several webpages, including but not limited to a "Home" page, an "About" page, and a "Products" page. The Mark is located in the top left corner of each webpage on Plaintiff's Website. Each webpage consists of text, pictures, and graphics relating to the copper products and the business in general. Some of the pictures are digitally altered for a more aesthetic effect.

24.     At no time did the parties enter into a written agreement, but the normal course of the supplier-distributor relationship proceeded as follows: (1) a consumer would place an order for the copper product through the Plaintiff's Website; (2) Plaintiff would communicate that order to Defendant; (3) the Defendant would then fill the order by creating the copper product; (4) in most instances the Defendant would fabricate and dropship the finished product directly to the customer using the Plaintiff's shipping account with Federal Express.

25.     Between 2010 and 2019, Plaintiff started an ancillary business selling various types of epoxy products over the internet through Plaintiff's Ancillary Website. The Plaintiff's Ancillary Website sells Plaintiff's own brand of epoxy known as UltraClear Epoxy.

5

26.    In January of 2019, Defendant approached Eric Wasser ("Wasser"), a person who proclaimed to be a webmaster, to help design a new website for him to bring in more business. Eric Wasser was directed by the Defendant to Plaintiff's Website and instructed to take any photos and text to be used as content to build his new website.

27.    In December of 2019, the Plaintiff discovered the new website and that his photos and text had been copied.  Plaintiff then contacted the Defendant and was told by the Defendant that Eric Wasser would make them both a lot of money and urged the Plaintiff to work together with him.  Plaintiff declined.

28.    Defendant proceeded to engage Wasser, who took control of various aspects of the Plaintiff's Website.  Wasser then proceeded to misappropriate the moneys coming in through the website while never delivering any copper products to customers.  Wasser eventually absconded with the money and, as of the date of this Complaint, cannot be located.

29.    As a result of Wasser's actions described in the previous paragraph, Plaintiff took down the Plaintiff's Website as it existed in 2019 over Defendant's objections in order to disassociate himself from the described actions of Wasser. Wasser then took control of various aspects of the Defendant's Website.  Wasser then proceeded to misappropriate the moneys coming in through the website while never delivering any copper products to customers.  Wasser eventually absconded with the money and, as of the date of this Complaint, cannot be located.

30.    After Plaintiff pulled the Plaintiff's Website, Defendant asked Plaintiff if he could purchase Plaintiff's Website from him, but Plaintiff refused this offer.

31.    After Defendant attempted to buy the Plaintiff's Website, Defendant proceeded to copy various aspects of the Plaintiff's Website for use on Defendant's newly created Infringing

6

Website.  Below are some comparisons of the Plaintiff's Website and the Infringing Website (see next page):





32.    In addition, at some point after the Plaintiff's Website was pulled, Defendant

proceeded to copy various aspects of the Plaintiff's Ancillary Website, a business in which

Defendant was not associated as a supplier, for use on Defendant's newly created Infringing Epoxy

Website.  Below are some comparisons of the Plaintiff's Ancillary Website and the Infringing

Epoxy Website (see next page):

## Plaintiff's Ancillary Website



## Infringing Epoxy Website



33.     Defendants have used Plaintiff's Mark both on their Infringing Website and as part of its URL/domain name without Plaintiff's permission and, furthermore, have ignored Plaintiff's demands that they cease and desist from such use.

34.     The Infringing Website has garnered hundreds of thousands of views and is creating confusion in the marketplace.   As show in the illustration below, a search for the words in Plaintiff's Mark on an internet search engine produces search results featuring Plaintiff's Mark.



35.     Defendants have used Plaintiff's Mark both on their Infringing Ancillary Website without Plaintiff's permission and, furthermore, have ignored Plaintiff's demands that they cease and desist from such use.

36.     Defendants have been, without authorization from or payment to Plaintiff, displaying the infringing Mark on the Infringing Website resulting in substantial revenue for Defendants.

37.     Both the Infringing Website and the Infringing Epoxy Website were publicized, on information and belief, in or before 2020, and has been displayed throughout the United States and various countries of the world, such that a search for the key words in Plaintiff's Mark "color" and "copper" in an internet search engine produces results that feature direct competitors to Plaintiff in association with Plaintiff's Mark, diluting the value and creating confusion in the marketplace.

38.     Upon information and belief, distributors of Defendants' copper products have been instructed to use Plaintiff's Mark for purposes of marketing Defendants' products, including using the Mark as keywords in advertising to mislead customers into believing that they are purchasing Plaintiff's products. See the following illustration:



39.     At all relevant times, Defendants were fully aware that in order to lawfully use the Mark, the Lanham Act requires them to obtain authorization from the owner of the trademarked work in the form of a license.

40.     Notwithstanding this knowledge, Defendants, without acquiring the necessary license, have willfully disregarded the applicable laws by displaying the Mark throughout the United States and various countries of the world.

41.     At all relevant times, Defendants were fully aware that in order to lawfully use the Works, the Copyright Act requires them to obtain authorization from the owner of the copyrighted work in the form of a license.

42.     Notwithstanding this knowledge, Defendants, without acquiring the necessary license, have willfully disregarded the applicable laws by displaying the Works throughout the United States and various countries of the world.

43.     CV, or, in the alternative, Defendant, by and through CV, created Defendants' Infringing Websites that quantitatively and qualitatively copies, at times in full and at other times in part, Plaintiff's Websites.  The copying of the Works for Defendants' Infringing Websites is obvious to any ordinary observer.  The webpages on Defendants' Infringing Websites are blatant copyright infringement and were used by Defendants to help sell copper and epoxy products to the general public; efforts which, upon information and belief, were successful.

44.     The actions described herein are an infringement of Plaintiff's §106 rights of distribution, reproduction, and display.

45.     On April 1, 2021, Defendants were given notice of the trademark and copyright infringements, yet Defendants, as of the time of the filing of this Complaint, still continue their infringing activities described in the above.

46.     By displaying and commercially exploiting the Mark and Works through Defendants' Infringing Websites without Plaintiff's permission and without paying royalties to Plaintiff, Defendants have infringed and trespassed on the exclusive rights in the Mark and Works granted to Plaintiff under the Lanham Act and Copyright Act, respectively.

## COUNT I
### Willful Copyright Infringement as to all Defendants
### [17 U.S.C. § 101 et seq.]

47.     Plaintiff repeats and re-alleges each of the foregoing paragraphs 1-46, as though fully set forth herein.

48.     Plaintiff is the owner of all rights, titles, and interests in the copyright in the Works embodied in Plaintiff's Website.

49.     Defendants did not seek or receive permission to copy, distribute, or display Plaintiff's Works on Defendants' Infringing Websites.

50.     The Infringing Website copies original, quantitatively, and qualitatively distinct, important, and recognizable portions of the Works, said portions of which are protectable under the Copyright Act.

51.     The Infringing Epoxy Website copies original, quantitatively, and qualitatively distinct, important, and recognizable portions of the Works, said portions of which are protectable under the Copyright Act.

52.     The literary components and visual elements of the Infringing Website and the Infringing Epoxy Website are virtually identical to Plaintiff's Website, Plaintiff's Ancillary Website and the Works embodied thereon.  These substantially similar elements, coupled with

Defendant's access, leave little doubt that numerous substantive and original elements of the Works have been copied by the Defendant.

53.     The Defendant admitted to Plaintiff that he intentionally copied the elements described in Paragraph 46.

54.     The foregoing conduct of Defendants constitutes, among other things, the improper preparation of derivative works as well as direct and willful infringement.

55.     Defendant's conduct, including infringement, has been, and continues to be, willful and knowing.

56.     With knowledge of the infringement, Defendants have induced, caused, or materially contributed to the infringing conduct of others, such that they should be found to be contributorily liable.

57.     In addition, Defendants had the right and ability to control other infringers and have derived a direct financial benefit from that infringement such that Defendants should be found to be vicariously liable.

58.     The inclusion of these elements of the Works greatly enhances the financial value of the Infringing Website and the Infringing Epoxy Website and increases its visibility on the internet.   Plaintiff uses proprietary language on Plaintiff's Websites and in the Works that incorporates unique search engine optimization techniques. Defendants' Infringing Websites have been successful primarily as a result of the successful advertising and display of the Works and Defendants are jointly and severally liable for all direct and indirect profits garnered from the exploitation of the Works. Defendants are also responsible for the damages of Plaintiff by their failure to properly license the Works for two globally accessible active websites.

59. Specifically, as a direct and proximate result of Defendants' conduct, Plaintiff has suffered actual damages including lost licensing revenue, lost profits, lost opportunities, loss of goodwill, and lost publicity. Pursuant to 17 U.S.C. § 504(b), Plaintiff is therefore entitled to damages, including the direct and indirect profits that Defendants derived from the Infringing Website and the Infringing Epoxy Website.

60. In the alternative, pursuant to 17 U.S.C. § 504(c), Plaintiff is entitled to statutory damages for each willful infringement, as proven, up to the maximum of $150,000 for each infringement. Plaintiff is also entitled to his costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. §505.

61. Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiff irreparable injury that cannot be fully compensated or measured in money. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. §502, Plaintiff is entitled to a permanent injunction prohibiting infringement of Plaintiff's copyrighted works and exclusive rights under the Copyright Act.

## COUNT II
### Breach of the Verbal Distribution Agreement as to Defendant and CV

62. Plaintiff repeats and re-alleges each of the foregoing paragraphs 1-61 as though fully set forth herein.

63. Starting in the early 2010's, Plaintiff and Defendant entered into a verbal agreement that Plaintiff would market, sell and distribute Defendant's aged copper and Defendant would fulfill the orders (the "Verbal Distribution Agreement"). This Verbal Distribution Agreement was confirmed by a course of conduct that lasted almost a decade.

64.     Defendants' association with Wasser breached the implied relationship of the Verbal Distribution Agreement and the association with Wasser damaged the reputation of the business built by Plaintiff.

65.     As a result of Defendants' breach of the Verbal Distribution Agreement, Plaintiff suffered actual damages including lost profits, lost opportunities, loss of goodwill, and lost publicity.

**COUNT III**
**Trademark Infringement against all Defendants for use of the Mark**
**[15 U.S.C. § 1125]**

66.     Plaintiff repeats and re-alleges each of the foregoing paragraphs 1-65 as though fully set forth herein.

67.     The Infringing Website, including its URL/domain name coloredcopper.com, infringes Plaintiff's Mark.

68.     The use and expansion of the term "coloredcopper" to describe Defendants' products and to rebrand all of his webpages and other derivative works with the term "coloredcopper" including webpage language, trade dress, photographs and merchandise that are identical to Plaintiff's Website all serve to violate the fanciful Mark and Plaintiff's trade dress by creating confusion in the marketplace and by diluting the value of Plaintiff's Mark.

69.     The words "color copper" and "colored copper" are similar, if not pragmatically indistinguishable. The difference between "colored copper" and "color copper" is a matter of degree in that Defendant has simply added the past tense "ed" to the Mark. Therefore, the words are essentially synonyms.

70. The words "color copper" are used by the Defendants to describe the same class of goods identified in Plaintiff's Mark as International Class 6, namely sheet metal comprised in whole or in part of copper.

71. Defendants' use of the Mark, similar to its infringement of the Works, is for the sole purpose of alluring Plaintiff's customers to its website in order to circumvent sales of Plaintiff's products by confusing the consumer into thinking that they are one and the same.

72. Defendant markets and advertises using the same online channels, forums and conventions that are used by Plaintiff.

73. The confusion between the Mark and "colored copper" is so pervasive that Defendants' website now appears in primary position on a Google search for "color copper."

74. Defendants' selection, incorporation and use of the Mark was done with full knowledge of the prior existence and extensive use Plaintiff's federally registered Mark and was done with the conscious and specific admitted intent of Defendant to expressly mislead and confuse the consuming public.

75. Defendants' acts alleged herein were willful and deliberate and have harmed Plaintiff in an amount to be determined at trial and such damage will increase unless Defendants are permanently enjoined from their wrongful actions.

76. Defendants' use of the Mark is causing immediate and irreparable harm and injury to Plaintiff and will continue to damage the goodwill and reputation of Plaintiff and confuse the public unless enjoined by the Court. Additionally, such damages will continue to occur unless this court permanently enjoins Defendants and their agents from such use.

**False Advertising and Unfair Competition against all Defendants**
**[15 U.S.C. § 1125]**

77.     Plaintiff repeats and re-alleges each of the foregoing paragraphs 1-76 as though fully set forth herein.

78.     The Defendants have made false and/or misleading statements of fact in interstate commerce concerning the characteristics, qualities, and source of their products by infringing the Mark and the Works.

79.     Defendants' marketing, advertising, promoting, distributing, and selling of the above referenced products and related merchandise using variations of Plaintiff's Works, Mark and Trade Names is without authority or license from Plaintiff.   The conscious use of this intellectual property, combined with the implied representation that the Defendants' works originated with, are associated with, or are endorsed or approved by Plaintiff constitute unfair competition and false advertising in violation of the Lanham Act.

80.     Defendants' use of the intellectual properties was done with the sole intent to deceive the consuming public and filter customers from Plaintiff's Websites to Defendants' Infringing Websites.

81.      Defendants have misled consumers to believe that there is an affiliation or association between their products and those distributed by Plaintiff.

82.     A substantial portion of the Defendants' intended audience is actually deceived or tends to be deceived into believing there is a connection to Plaintiff's Website and Plaintiff's Ancillary Website.

83.     Consumers are likely to be influenced into buying the Defendants' products by their false belief that they are connected to Plaintiff's Website and Plaintiff's Ancillary Website.  In the

alternative, consumers are apt to believe that the products purchased from Defendants' Infringing Websites derive from the Plaintiff and incorrectly associate the poorer quality and service provided by Defendant thereby denigrating the goodwill and reputation built by Plaintiff.

84.     The Plaintiff is harmed by the confusion between the Mark and Defendants' use of the substantially similar "colored copper" and the Infringing Epoxy Website. Consumers may mistakenly spend money on the Defendants' products in the belief that they are going to receive Plaintiff's products. In the alternative, the value of Plaintiff's products and services is reduced by the incorrect association with a work or works that are of inferior quality or are inconsistent with products and services provided by Plaintiff.

85.     Defendants' acts alleged herein were willful and deliberate and have harmed Plaintiff in an amount to be determined at trial and such damage will increase unless Defendants are permanently enjoined from their wrongful actions.

86.     Defendants' use of the Mark is causing immediate and irreparable harm and injury to Plaintiff and will continue to damage the goodwill and reputation of Plaintiff and confuse the public unless enjoined by the Court. Plaintiff has no adequate alternative remedy at law to an injunction.

## COUNT IV
### Trade Name & Trade Dress Infringement against all Defendants
### [15 U.S.C. § 1125]

87.     Plaintiff repeats and re-alleges each of the foregoing paragraphs 1-86 as though fully set forth herein.

88.     Plaintiff created distinctive logos, symbols, artwork, photographs, designs, works and other indicia of trade dress on Plaintiff's Website and Plaintiff's Ancillary Website which have

come to be recognized by the purchasing and consuming public as emanating from Plaintiff, as shown in Plaintiff's Website and Plaintiff's Ancillary Website.

89.     In an effort to pass off its Infringing Website and Infringing Epoxy Website as that of Plaintiff's adopted trade indicia, Defendant adopted, copied, and continues to employ confusingly similar trade indicia.

90.     Defendants, with the full knowledge of the facts set forth above and with the intention of appropriating unto their selves the goodwill and sales appeal and the trade and public preference for Plaintiff's distributed products achieved by Plaintiff through the extensive exposure to the public and their knowing of the good name and reputation acquired by the Plaintiff in the sale and distribution of its products, and in order to deprive Plaintiff of the gains, profits, benefits and advantages that might and otherwise should and would have accrued to it, with the intent to injure and defraud the Plaintiff and to deceive and confuse the purchasing public in trade as to the origin or source of the Plaintiff's distributed products, and for the purpose of trading upon and taking advantage of the reputation and goodwill of the Plaintiff and to produce a false impression, did unlawfully, unjustly, wrongfully and in willful disregard to the Plaintiff's rights, appropriate, simulate, copy and imitate Plaintiff's trade indicia and trade dress and employed and continues to employ their imitative trade dress in this district as well as the United States and internationally, in connection with the selling and offering for sale of the Defendants' products and services.

91.     The continued unauthorized use by the Defendant of the confusingly similar trade dress in connection with products and services of the same kind as the Plaintiff has caused and will inevitably cause, confusion and deception to the trade and public, and will lead them erroneously to associate the services, products, or Works of the Plaintiff with the Defendants, and erroneously to believe the Defendants' goods and services are either sold or sponsored by the

Plaintiff or being placed upon the market with the consent and authority of the Plaintiff as a result of which the continued use by Defendant of such trade dress has caused, and unless restrained, will continue to cause serious and irreparable injury to the Plaintiff.

92.     Defendants appropriated Plaintiff's distinctive trade dress as stated with the intent and purpose of misleading the trade and public, simulating Plaintiff's Websites, Works, and trade dress, and wrongfully trading upon and benefiting from, the goodwill built up by the Plaintiff.

93.     The continued simulation by Defendant of Plaintiff's trade dress and all of the deceptive acts of the Defendant as alleged above, has caused, and will continue to cause confusion and deception to the trade and the public, and the unfair competition by the Defendant has caused, and unless restrained, will continue to cause, confusion and deception of the trade and public, and the unfair competition by Defendant has caused, and unless restrained will continue to cause, serious and irreparable injury to the Plaintiff.

94.     Defendants' acts alleged herein were willful and deliberate and have harmed Plaintiff in an amount to be determined at trial and such damage will increase unless Defendants are permanently enjoined from their wrongful actions.

95.     Defendants' use of Plaintiff's trade dress is causing immediate and irreparable harm and injury to Plaintiff and will continue to damage the goodwill and reputation of Plaintiff and confuse the public unless enjoined by the Court.  Plaintiff has no adequate alternative remedy at law to an injunction.

**<u>COUNT V</u>**
**For Violations of the Visual Artists Rights Act of 1990 ("VARA"), including the rights of integrity and paternity, against all Defendants**
**[17 U.S.C. §106A]**

96.     Plaintiff repeats and re-alleges each of the foregoing paragraphs 1-95 as though fully set forth herein.

97.     In addition to ownership of the physical copies of the Copyright Photographs, VARA provides that a creator has certain "moral" rights in Plaintiff's Works, including the right to paternity or attribution, i.e., to be known as the author of the Works, and the right of integrity, i.e., to prevent others from distorting or modifying their work.  These rights survive for the life of the author or the term of copyright.

98.     Defendants' infringements of VARA were willful. Defendants were fully aware of that the unauthorized use of Plaintiff's Websites infringed Plaintiff's exclusive rights under §106A of the Copyright Act or, at least, recklessly, and irresponsibly ignored the likelihood thereof.  The willfulness of Plaintiff's infringement is further demonstrated by: (i) Defendants appending a copyright notice in their own websites using the infringing materials; (ii) their utilization of the Plaintiff's textual content such that Defendant's websites would rank higher on web search engines; (iii) their taking of copyrighted photographs from a Plaintiff's Website and brochures; and (iv) their continued use, sale and distribution of products identical to those distributed by Plaintiff after receiving cease and desist letters from Plaintiff's counsel.

99.     Plaintiff alleges on information and belief that the Defendants, and each of them, have committed violations of VARA, as alleged above, which were willful, intentional, and malicious, which further subjects Defendants, and each of them, to liability for statutory damages under Section 504(c)(2) of the Copyright Act in the sum of up to $150,000.00 per infringement and/or a preclusion from asserting certain equitable and other defenses.

100.     In the alternative, Plaintiff alleges actual damages in an amount to be proven at trial.

**False Designation of Origin against all Defendants**
**[15 U.S.C. §1125 & 47 T.C.A. §104(b)]**

101.  Plaintiff repeats and re-alleges each of the foregoing paragraphs 1-100 as though fully set forth herein.

102.  The cause of action in the second claim for relief arises under The Lanham Act, 15 U.S.C. §1125 and under the Tennessee Consumer Protection Act, 47 T.C.A. §104(b).

103.  Defendants falsely designated themselves as the author of the Infringing Website and the Infringing CV Website.  Thusly failing to properly designate Plaintiff as the author is a material misrepresentation as to the origination of the Works embodied in the Infringing Website and the Infringing CV Website which creates a likelihood of confusion that mistakenly causes the public to draw the conclusion that Defendants are the author of the Works.

104.  Upon information and belief, Defendants violated 40 T.C.A. §104(b) through falsely designating themselves as the creator of the Works embodied in the Infringing Websites and the Infringing CV Website by:  (a) falsely passing off goods or services as those of another (40 T.C.A. §104(b)(1)); (b) causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of their use of the Marks (40 T.C.A. §104(b)(2)); (c) causing likelihood of confusion or misunderstanding as to a connection between the Defendants and the Plaintiff (40 T.C.A. §104(b)(3)); and (d) representing that the Infringing Website and Infringing CV Website have characteristics, uses and benefits that it did not have  (40 T.C.A. §104(b)(5)).

105.  As a direct and proximate result of the foregoing willful acts and conduct of Defendants and by reason of their violation of 15 U.S.C. §1125 and 47 T.C.A. §104(b), as

hereinabove set forth, Plaintiff has been damaged in an amount which Plaintiff cannot presently ascertain with certainty, plus interest thereon.

<u>COUNT VII</u>
**Conversion against all Defendants**

106.    Plaintiff repeats and re-alleges each of the foregoing paragraphs 1-105 as though fully set forth herein.

107.    Defendants stole photographs and text from Plaintiff's Website, Plaintiff's Ancillary Website, as well as other Works, with the full knowledge, and with total disregard to the fact, that these materials were created by and belonged to Plaintiff, and with full awareness that they were violating intellectual property laws.

108.    Defendants intentionally used Plaintiff's Works to create derivative works in total disregard to Plaintiff's ownership of thereof.

109.    Defendants have continuously received and used for their benefit significant revenues from third parties for the sale their products generated by their illicit use of Plaintiff's Works in violation of Plaintiff's exclusive rights.

110.    As a direct and proximate result of the foregoing willful acts and conduct of Defendants as hereinabove set forth, Plaintiff has been damaged in an amount which Plaintiff cannot presently ascertain with certainty, plus interest thereon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgement against Defendants and for the following relief:

I.　　　　a declaration that Defendants have willfully infringed Plaintiff's Mark in violation of the Lanham Act;

II.　　　　a declaration that Defendants have willfully infringed Plaintiff's copyrighted Works in violation of the Copyright Act;

III.　　　　a declaration that Defendants have breached the Verbal Agreement;

IV.　　　　a permanent injunction requiring Defendants and Defendants' agents, servants, employees, officers, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert or participation with each or anyone of them, to cease directly and indirectly infringing, and causing, enabling, facilitating, encouraging, promoting, inducing, and/or participating in the infringement of any of Plaintiff's rights protected by the Lanham Act and the Copyright Act;

V.　　　　pursuant to 17 U.S.C. § 504(b), Plaintiff's actual damages, including Defendants' direct and indirect profits from the infringement, as will be proven at trial, or in the alternative, the maximum amount of statutory damages pursuant to 17 U.S.C. § 504(c) for each act of willful infringement;

VI.　　　　pursuant to 15 U.S.C. §§ 1114, 1117, and 1125, Plaintiff's actual damages, including Defendants' direct and indirect profits from the infringement, as will be proven at trial, or in the alternative, the maximum amount of statutory damages pursuant to 15 U.S.C. §1117 for each act of willful infringement

VII.　　　　Plaintiff's actual damages for Defendants' breach of the Verbal Agreement;

VIII.        a declaration that Defendants are directly, vicariously, and/or contributorily liable, as applicable;

IX.        granting Plaintiff statutory damages in the maximum amount allowed under §§106A and 504 of the Copyright Act, or, alternatively at Plaintiff's election, actual damages suffered by Plaintiff and profits or other advantages derived by Defendants arising out of or related to Defendants' violations of Plaintiff's rights of attribution, paternity and/or integrity, in amounts to be proven;

X.        awarding Plaintiff his attorneys' fees and full costs, pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117;

XI.        granting Ms. Tria damages in amounts to be proven for the common law claims of conversion, unjust enrichment, and quantum meruit;

XII.        for pre-judgment and post-judgment interest according to law, as applicable; and

XIII.        for such other and further relief as this Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Local Rule 7.03(b), and otherwise, Plaintiff respectfully demands a trial by jury.


Dated: July 20, 2021                    By: /Barry N. Shrum/
                                       Barry Neil Shrum (TN Bar No. 019703)
                                       Cheshire Rigler (TN Bar No. 038704)
                                       Shrum Hicks & Associates, P.C.
                                       407c Main Street
                                       Suite 206
                                       Franklin, Tennessee 37064
                                       Telephone: (615) 338-5130
                                       E-mail: barry@shrumhicks.com

**Exhibit A**

Trademark Registration for the Mark

**Exhibit B**

Copyright Registration for Copyright 1

**Exhibit C**

Copyright Registration for Copyright 2

**Exhibit D**

Copyright Registration for Copyright A