# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**DONALD A. CHIUSA, JR. and**        )
**COLOR COPPER LLC,**        )
        )
**Plaintiffs,**        )
        )
**v.**        )        **Case No. 3:21-cv-00545**
        )        **Judge Aleta A. Trauger**
**FRED STUBENRAUCH and**        )
**COPPER VENTURES LLC,**        )
        )
**Defendants.**        )

## <u>MEMORANDUM</u>

Defendants Fred Stubenrauch and Copper Ventures LLC ("CV") have filed a Motion to Dismiss First Amended Complaint (Doc. No. 46), to which plaintiffs Donald A. Chiusa, Jr. and Color Copper LLC ("CC") have filed a Response (Doc. No. 54), and the defendants have filed a Reply (Doc. No. 59). For the reasons set out herein, the motion will be granted in part and denied in part.

## <u>I. BACKGROUND</u>[1]

### <u>A. History</u>

The parties in this case are former business associates. Stubenrauch, who lives in Tucson, Arizona, is the controlling member of CV, which makes and sells "residential fixtures and décor made from aged and/or etched copper." (Doc. No. 37 ¶¶ 14, 24.) Stubenrauch's treated copper sheets feature patterns that are unusually colorful compared to the metal's ordinary appearance:

---

[1] The facts herein are taken from the First Amended Complaint (Doc. No. 37) and are treated as true for the purposes of Rule 12(b)(6).

1



(Doc. No. 37-3 at 50.)

Chiusa, who lives in Spring Hill, Tennessee, is the owner and operator of CC, which "create[es] commercial websites and sell[s]various products for manufacturers." (Doc. No. 37 ¶ 4.) In the early 2010s, Stubenrauch approached Chiusa about working together to launch a website selling Stubenrauch's copper lampshades and mirrors. (*Id.* ¶ 24.) Chiusa agreed, and the venture was apparently enough of a success—or at least showed enough promise—that the two men decided to expand their collaboration. They agreed that Chiusa would create and operate a website marketing Stubenrauch's copper sheets "to a new industry for copper countertops, bar tops and kitchen backsplash." (*Id.* ¶ 25.) That website, located at http://www.colorcopper.com, would function as an online distributorship of Stubenrauch's products under the trade name COLOR COPPER.COM.[2] (*Id.* ¶¶ 25–26.)

---

[2] The space between "color" and "copper" is apparently intentional and appears in CC's trademark registration, which the court will discuss *infra*. To reflect the registration, the court will use the space when discussing the mark itself. The space, however, does not (and could not) actually appear in the underlying website URL.

2

The parties went forward with the http://www.colorcopper.com project, but they never signed a formal written document memorializing and defining the nature of their business relationship. Chiusa asserts, however, that their dealings followed the "normal course of the supplier-distributor relationship," which Chiusa describes as follows:

> (1) a consumer would place an order for the copper product through the Plaintiffs' Website; (2) Mr. Chiusa would communicate that order to Mr. Stubenrauch; (3) Mr. Stubenrauch and CV would then fill the order by creating the copper product; (4) in most instances Mr. Stubenrauch and CV would fabricate and dropship the finished product directly to the customer using Mr. Chiusa's shipping account with Federal Express; (5) on rare occasions and in special circumstances, Mr. Stubenrauch and CV would ship the customers' finished order to Plaintiffs in Tennessee, and Plaintiffs would ship it to the customer.

(*Id.* ¶ 28.) The parties continued doing business on those terms for nearly a decade, between 2010 and 2019. (*Id.* ¶ 29.)

In January 2019, however, Stubenrauch contacted another man, Eric Wasser, about creating a new website for CV. Stubenrauch did not inform Chiusa of the plan, but he told Wasser that he was free to use photos and text from Chiusa's website. (*Id.* ¶ 30.) Wasser accepted the assignment and built the new website, which Chiusa eventually discovered in December of that year. Chiusa contacted Stubenrauch to investigate the situation, and Stubenrauch invited Chiusa to "work together with" Wasser, who, Stubenrauch told Chiusa, would "make them both a lot of money." (*Id.* ¶ 31.) Chiusa declined the offer. (*Id.*)

Chiusa's decision not to go into business with Wasser turned out to be a wise one, at least according to the First Amended Complaint. Wasser allegedly "proceeded to misappropriate the moneys coming in through the website while never delivering any copper products to customers," eventually "abscond[ing] with the money." (*Id.* ¶ 32.) Wasser—who, at least as of the filing of the First Amended Complaint, still had not been tracked down (*Id.*)—is not a party to this case and therefore has not had the opportunity to defend himself against the serious allegations against him.

3

This case, however, is not ultimately about what Wasser may have done. It is, rather, about the chain of events that Wasser's actions set in motion.

Chiusa, who says he was concerned that his own reputation might be damaged by his association with Stubenrauch in the wake of the Wasser fiasco, took down CC's http://www.colorcopper.com website marketing the CV products. (*Id.* ¶ 33.) Stubenrauch urged Chiusa not to shut the site down, and, when Chiusa refused his request, Stubenrauch offered to buy the http://www.colorcopper.com site from him. Chiusa rebuffed that proposal as well. As a result, Stubenrauch was suddenly left without either his preexisting revenue stream from Chiusa's website or the expected new revenue stream from Wasser's. (*Id.* ¶¶ 33–35.)

In in an attempt to right the ship and offset his losses, Stubenrauch created a new website, which the court will refer to as the "Subject Copper Website," based on its role in this case. The Subject Copper Website appears to use many of the photographs that Chiusa had used on the http://www.colorcopper.com website and to reproduce at least some portions of the original site's text. (*Id.* ¶ 35 & illustrations.) Stubenrauch's new website can be found at http://www.coloredcopper.com—that is, the same address as the scuttled collaborative website, with "color" changed to "colored"—and uses a logo of the trade name COLOREDCOPPER.COM that shares a number of visual characteristics with the COLOR COPPER.COM mark. (*See id.*)

Stubenrauch also allegedly created a new website directly competing with another of Chiusa's ventures. At some point during the parties' relationship, Chiusa had started what he refers to as an "ancillary business selling various types of epoxy products over the internet" under the trade name ULTRACLEAR EPOXY. (*Id.* ¶ 29.) After the parties' falling out, Stubenrauch created his own website selling epoxy, which the court will refer to as the "Subject Epoxy Website." (*Id.*

4

¶ 36.) The Subject Epoxy website uses language that appears to be taken directly from Chiusa's site. (*Id.*)

On July 20, 2021, Chiusa filed a Complaint against Stubenrauch, CV, and another corporate defendant that is no longer part of this case. (Doc. No. 1.) On October 4, 2021, Chiusa—now joined by CC as a co-plaintiff—filed the First Amended Complaint. (Doc. No. 37.) The plaintiffs state what they characterize as seven counts, although they plead more than seven theories of liability. Count I is for willful copyright infringement. (*Id.* ¶¶ 54–68.) Count II is for breach of the oral distribution agreement between Chiusa/CC and Stubenrauch/CV. (*Id.* ¶¶ 69–72.) Counts III through VI are all Lanham Act claims, for, respectively, trademark infringement (Count III), false advertising (Count IV), trade dress infringement and "trade name infringement" (Count V), and false designation of origin (Count VI). (*Id.* ¶¶ 73–110.) Count VI also appears to have been intended to include a Tennessee Consumer Protection Act ("TCPA") claim, which should have been pleaded pursuant to Tenn. Code Ann. § 47-18-104(b).[3] (*Id.* ¶¶ 106–10.) Count VII is for conversion. (*Id.* ¶¶ 111–15.)

**B. The Plaintiffs' Registrations**

In support of their claims, the plaintiffs have filed four certificates of federal registration for pieces of intellectual property, as well as some supporting documentation.

1. The COLOR COPPER.COM Design Mark

On January 12, 2021, the United States Patent and Trademark Office ("USPTO") granted CC registration of a design mark "consist[ing] of the stylized wording 'COLOR COPPER.COM',

---

[3] The plaintiffs cite "40 T.C.A. § 104," which is incorrect, as well as "47 T.C.A. §104(b)," which appears to be an attempt to cite the correct section but which uses a citation form that omits the chapter number of the cited statute, a necessary piece of information under the Tennessee Code Annotated's codification practices.

5

[with] a diamond shape between the wording 'COLOR' and 'COPPER' made up of four smaller diamonds, each diamond having a pattern inside of it." (Doc. No. 37-1 at 1.)



The registration of the COLOR COPPER.COM design mark includes the disclaimer that "[n]o claim is made to the exclusive right to use the following apart from the mark as shown: 'COPPER.COM.'" (*Id.*) The registration includes a claimed first use in commerce of February 16, 2010. (*Id.*)

### 2. The Color Copper Website

On June 15, 2021, the United States Copyright Office granted Chiusa a copyright registration for a "Color Copper Website." (Doc. No. 37-4 at 1.) According to the Certificate of Registration, the author of the underlying copyright-protected work was Chiusa, who created the "[n]ew and revised text and photographs" included on the website. (*Id.*) The certificate expressly states that the "[p]revious version of the website" is excluded from the registration, but that language is not accompanied by any clarification regarding which elements were new, and therefore (at least potentially) covered by the registration, and which were old, and therefore subject to the disclaimer. (*Id.*) The copy of the website deposited with the Copyright Office appears to consist of 7 pages of printouts from the http://www.colorcopper.com website. (Doc. No. 37-5.)

### 3. The UltraClear Epoxy Website

Also on June 15, 2021, the Copyright Office granted Chiusa a registration for an "UltraClear Epoxy Website." (Doc. No. 37-6 at 1.) This registration, similarly to the other website registration, identifies Chiusa as the creator of "text, photograph(s), [and] artwork" in the registered work and includes a disclaimer excluding the undefined "previous version" of the

6

website. (*Id.*) The copy deposited with the Copyright Office appears to be five pages of printouts of a website with the URL of http://www.bestbartopepoxy.com/epoxy/. (Doc. No. 37-7.)

### 4. The Color Copper Brochure

On June 17, 2021, the Copyright Office granted Chiusa a copyright registration for a "Color Copper Brochure." (Doc. No. 37-2 at 1.) The registration identifies Chiusa as the author of the copyrighted work, stating that he created "text, photograph(s), [and] artwork on p.1" therein. (*Id.*) The copy of the brochure deposited with the copyright office is 50 pages long and consists primarily of photographs depicting products and product features purportedly available from "ColorCopper.com." (Doc. No. 37-3.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal

conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## III. ANALYSIS

### A. Copyright Infringement

Included in a copyright holder's rights are the right to reproduce the copyright-protected work and the right to make "derivative works" that are not identical to, but are derived from, the original work. 17 U.S.C. § 106(1)–(2). Generally speaking, a person becomes liable for copyright infringement if he engages in a protected use of a copyright-protected work without either permission from the owner or, in the alternative, some legally recognized automatic right of use— such as the right to engage in fair use[4] or the right to an automatic statutory license.[5] Based on those principles, a claim of copyright infringement typically "requires proof of '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *ATC Distribution Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 705 (6th Cir. 2005) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

---

[4] The fair use doctrine "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1385 (6th Cir. 1996) (quoting *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577 500 (1994)) (alteration in original).

[5] For example, Congress has created "statutory licenses [that] enable digital audio services to perform copyrighted sound recordings by paying predetermined royalty fees, without separately securing a copyright holder's permission." *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 46 (D.C. Cir. 2018).

Case 3:21-cv-00545   Document 62   Filed 07/15/22   Page 8 of 29 PageID #: 434

The defendants argue first that the plaintiffs have not sufficiently identified which elements of the underlying websites and brochure they consider to be copyright-protected. The copyright registration certificates make clear that Chiusa claims ownership of rights to only some components of the underlying works, but the certificates provide little, if any, guidance for sorting the claimed elements from the non-claimed elements. Moreover, there are likely some elements of the underlying works that are not only not Chiusa's, but are not protectable by copyright at all. Copyright protection is not available to any and all printed materials, websites, or other pieces of communication without exception. Rather, "[t]he United States Constitution requires that," for a work to qualify for copyright protection, "the work [must] be 'original.'" *Tomaydo–Tomahhdo, LLC v. Vozary*, 629 F. App'x 658, 660 (6th Cir. 2015) (citing U.S. Const. art. I, § 8, cl. 8; *Feist*, 499 U.S. at 346). Purely factual information, in contrast, is "free to the world." *Stromback v. New Line Cinema*, 384 F.3d 283, 296 (6th Cir. 2004) (quoting *Taylor v. Metro–Goldwyn–Mayer Studios*, 115 F. Supp. 156, 157 (S.D. Cal. 1953)). Similarly, courts have held that copyright protection does not prevent the use of "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Stromback*, 384 F.3d at 296 (quoting *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 616 (7th Cir. 1982)). Accordingly, simple facts and common turns of phrase that appear in marketing materials—for example, about the features of a material or technology—are not protected by copyright.

Marketing materials such as these may also implicate the limitation that copyright is unavailable for the purely "utilitarian aspects of" a creation—that is, its "functionality," as opposed to its aesthetic content. *Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 481 (6th Cir. 2015) (quoting 17 U.S.C. § 101), *aff'd sub nom. Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137

9

S. Ct. 1002 (2017). The creative, non-functional aspects of a useful design may be independently protectable, but only insofar as they "can be separately identified from, and exist independently of, [the] useful article." *Star Athletica*, 137 S. Ct. at 1008. The functionality itself, however, is not copyright's concern. For example, two competitors may have identical functional features of their websites without implicating copyright law, as long as there is no infringement on any expressive element. Drawing the line between functional and non-functional features can, of course, sometimes be difficult.

The defendants argue that many elements of the underlying websites are purely functional and/or factual and are not entitled to copyright protection, and that may well be true. However, other elements, such as the visual depictions and creative verbal descriptions included on the websites and in the brochure, are plausibly entitled to protection. While the plaintiffs could have been more precise in breaking down all of the constituent elements for which they are asserting protection, the court is required to construe the First Amended Complaint favorably to their position and only to dismiss their claims if they have failed to plead any plausibly actionable infringement. Doing so, the court finds that the plaintiffs have specifically identified at least some plausibly protected elements in the websites and brochure that were replicated in some of the defendants' materials.

For example, the defendants have reused specific photos from the plaintiffs' http://www.colorcopper.com website. (*See* Doc. No. 37 at 9.) Moreover, the Subject Epoxy Website includes a number of full sentences that appear verbatim (or nearly so) on the plaintiffs' site, such as the following passage, with the differences between the websites noted in brackets:

> [UltraClear epoxy/DuraClear™ epoxy] boasts the most advanced level of shine, gloss, reflectivity, clarity and depth, and it locks in those optical qualities forever. The most sophisticated system of synthetic polymeric-based protection available.

10

> Our Commercial-grade epoxy is engineered specifically for Bar Tops, Tabletops &
> Countertops.

(Doc. No. 37 at 11 (emphasis omitted).) While the protection available to that text and/or the reproduced photos may be somewhat limited, given that they convey factual information, they do contain some creative elements that are plausibly entitled to protection, such that outright copying would be prohibited.[6]

The defendants argue next that, insofar as the plaintiffs have sufficiently identified the allegedly protected elements of the websites and brochure, the plaintiffs have failed to plead, with sufficient detail, that they actually own the rights to those elements.[7] The defendants point out that, while the plaintiffs' certificates of registration might ordinarily provide *prima facie* evidence that they own the relevant copyrights, the plaintiffs' delay in registering at least some of the materials should prevent them from relying on such a presumption. A certificate of registration is only *prima facie* evidence of validity if it was "made before or within five years after first publication of the work"; otherwise, "[t]he evidentiary weight to be accorded the certificate of a registration . . . shall be within the discretion of the court." 17 U.S.C. § 410(c). The certificate of registration for the brochure, for example, describes the brochure as having been first published in 2013, but not

---

[6] With regard to the issue of functionality in particular, the defendants argue that the overlapping website text from the epoxy websites is unprotected because the language was selected for the purpose of supporting positive search engine results, not conveying information to the human reader directly. The court need not wholly resolve, at this juncture, whether that argument might be viable for some aspects of the underlying website language, because the plaintiffs have sufficiently pleaded infringement of other elements. The court notes, however, that the cited text is neither an unintelligible list of keywords nor separate from the user-facing portions of the websites, and the defendants identify no caselaw suggesting that such language becomes exempt from copyright protection merely because its author had search engine results in mind, among the other functions of the text, when writing it.

[7] The plaintiffs have sought to introduce additional evidence, outside the four corners of the Complaint, addressing this issue. "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). The court, in its discretion, elects not to consider the additional materials and therefore will not convert the motion.

registered until 2021, meaning that the defendants appear to be correct that no automatic presumption of validity is available. The lack of that presumption, however, is primarily a hindrance to a plaintiff's ability to make his case, not his ability to plead it. Regardless of any delay in seeking registration, a plaintiff can state a claim by sufficiently pleading actual ownership.

The First Amended Complaint alleges that the "copyrighted pictures, images, text, and artwork embodied" in the websites and brochure were "either created, taken, bought by, or assigned to" the plaintiffs, but it does not provide any more detail. (Doc. No. 37 ¶ 23.) That bare-bones assertion does test the boundaries of sufficient pleading. That said, the plaintiffs' broad language makes more sense when one considers that they are discussing works with multiple components, some of which they may have come to hold the rights for through different means. A given section of the brochure, for example, could include one purchased photograph, one photograph made as a work-for-hire, and a piece of text written by Chiusa himself. Tracing the accumulation of every right involved would be a substantial undertaking. In any event, the governing standard here is not what the plaintiffs could have pleaded, but what Rule 8 requires. Ultimately, as much as it may seem like the plaintiffs should be able to plead more detail—after all, how can they know that they *do* own the materials at issue if they do not know *how* they own them?—that does not mean that they were required to do so. The court will only grant a Rule 12(b)(6) motion if the complaint actually falls short of pleading a plausible claim.

If the plaintiffs are ultimately unable to establish their actual ownership of the copyrights—which seems likely to require considerably more detail than they have pleaded—it will be fatal to their copyright claims. The Federal Rules of Civil Procedure, however, require only that the plaintiffs state a plausible claim for relief, not that they outline all of the foundational facts that they will ultimately need to prove. The defendants have not identified any caselaw suggesting that,

in order to state a plausible claim for relief for copyright infringement, a plaintiff must plead not only ownership itself but also the detailed story of how the plaintiff obtained that ownership. It is sufficient that these plaintiffs have alleged that they held the underlying rights, which the defendants infringed. The court therefore will not dismiss the claims for copyright infringement.

## B. Lanham Act and Related State Claims[8]

### 1. Trademark Infringement

The elements of a claim for trademark infringement under the Lanham Act are: (1) the plaintiff's ownership of the rights to a valid trademark; (2) the defendant's use of the mark or a similar mark in commerce; and (3) a likelihood that the defendant's use would cause confusion. *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009); *see also* 15 U.S.C. § 1114(1). The defendants argue that the plaintiffs cannot satisfy the first element because their registered trademark, COLOR COPPER.COM, is not valid, or at least does not include any valid rights that would support the plaintiffs' claims. The defendants argue that "color copper" is just an ordinary and straightforward way to describe copper that has been treated to have a striking color—precisely what the defendants sell—and therefore they should be free to use that phrase or any similar phrase in association with their wares without implicating the Lanham Act.

As a preliminary matter, there is some confusion in the briefing regarding the nature of the plaintiffs' claims. The defendants suggest that the plaintiffs "purport to assert two different trademarks": the registered COLOR COPPER.COM trademark and an unregistered word mark

---

[8] Although the Lanham Act is most commonly thought of in connection with trademarks, it also generally addresses the topic of "unfair competition." As one commonly cited treatise has observed, "[p]erhaps no term of art in this field of law has over the years provoked such a confusion of definitions as 'unfair competition.'"1 McCarthy on Trademarks and Unfair Competition § 1:8. Because the "broad umbrella of 'unfair competition'" can be confusing, *Veteran Med. Prod., Inc. v. Bionix Dev. Corp.*, No. 1:05-CV-655, 2009 WL 891724, at *7 (W.D. Mich. Mar. 31, 2009), the court will discuss the various Lanham Act causes of action chiefly in terms of their narrower, more specific formulations, such as trademark infringement and false advertising.

consisting solely of the phrase "color copper." (Doc. No. 47 at 11–12.) The First Amended Complaint itself, however, states that the trademark infringement claim is based on "Plaintiffs' Mark," which is defined to include " the registered trademark COLOR COPPER.COM . . . as well as the common law [trademark] colorcopper.com and the corresponding URL." (Doc. No. 37 ¶¶ 5, 74.) It is therefore not clear that the plaintiffs actually assert any rights to the phrase "color copper," independently from that phrase's use with the design mark and/or the ".com" suffix.

Ultimately, though, the court finds these distinctions largely beside the point—at least at this stage. Whether or not the plaintiffs have any separate, independent rights in the phrase "color copper" or "colorcopper.com," they do have a registered design mark that *includes* those phrases (or a slight variation thereon). The COLOR COPPER.COM mark is a "composite mark" containing both pictorial and verbal elements, and, as such, it is evaluated as a whole for the purposes of trademark protection. *See* 4 McCarthy on Trademarks and Unfair Competition § 23:47. The description accepted by the USPTO for the registration of the mark, moreover, makes clear that CC, as the registrant, has disclaimed only the exclusive rights to "copper.com," not the right to protection for the verbal elements of the mark altogether:

> The mark consists of the stylized wording "COLOR COPPER.COM", a diamond shape between the wording "COLOR" and "COPPER" made up of four smaller diamonds, each diamond having a pattern inside of it.

> No claim is made to the exclusive right to use the following apart from the mark as shown: "COPPER.COM[.]"

(Doc. No. 1-1 at 1.) The plaintiffs, accordingly, do not necessarily need to establish separate rights in a pure word mark to have at least some of the protection they seek. Any use of the phrase "color copper," "colorcopper.com," or similar phrase that actually creates a likelihood of confusion with the registered mark is potentially actionable based on the registered mark, as long as the registered

14

mark, at least, is valid. The court, accordingly, will turn to the degree of protection to which the registered mark is entitled. [9]

Because it was registered only recently, COLOR COPPER.COM is not incontestable; rather, it possesses a rebuttable presumption of validity. *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 513–14 (6th Cir. 2007) (citing *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001)). The defendants argue that the registered mark, or at least a significant portion of it, suffers from the same issue as the alleged unregistered word mark. In order to be a protectable trademark, a mark must be capable of signaling the origin of a good or service, and, in order to do that, the mark "must be distinctive." *Papa Ads, LLC v. Gatehouse Media, Inc.*, 485 F. App'x 53, 55 (6th Cir. 2012) (citing *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir. 2002)). The defendants argue that "color copper" is simply a description of the product they sell and is therefore incapable of suggesting that the plaintiffs were the source of a product. Under that interpretation, the plaintiffs would, at most, have protection for the purely pictorial and design elements of the logo, with the equivalent of a disclaimer of all verbal rights, not merely the exclusive right to "copper.com." The plaintiffs, however, dispute the defendants' interpretation of their rights and argue that they have the right to prevent competitors, such as the defendants, from using the term "color copper" or a similar term in a manner likely to create confusion.

As the Supreme Court has noted, "[m]arks are often classified in categories of generally increasing distinctiveness; following the classic formulation . . . , they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*,

---

[9] As the defendants point out, the fact that the USPTO did not require a disclaimer for a particular aspect of a mark does not necessarily establish that that element is protectable. *See Humboldt Wholesale, Inc. v. Humboldt Nation Distribution, LLC*, No. C-11-4144 EMC, 2011 WL 6119149, at *3 (N.D. Cal. Dec. 8, 2011).

505 U.S. 763, 768 (1992). (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2nd Cir. 1976)). The latter three categories are considered inherently distinctive and are entitled to protection without showing any additional "acquired distinctiveness" arising out of the relevant mark's real-world use. *Id.* On the other end of the spectrum, "generic marks are never protected under the Lanham Act." *Curcio Webb LLC, v. Nat'l Benefit Programs Agency, Inc.*, 367 F. Supp. 2d 1191, 1208 (S.D. Ohio 2005) (citation omitted); *see also Two Pesos*, 505 U.S. at 768 ("[G]eneric marks . . . are not registrable as trademarks."). Sitting between those two poles are descriptive marks, which may become registrable and protectable, despite their lack of *inherent* distinctiveness, if they have acquired a "secondary meaning" through their actual use in commerce. *Two Pesos*, 505 U.S. at 769. Secondary meaning occurs when "it can be determined that the attitude of the consuming public toward the mark denotes a single thing coming from a single source." *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989) (internal quotation marks and citation omitted). Thus, a descriptive mark has acquired secondary meaning when it has "becom[e] distinctive of the [seller's] goods." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996) (quoting *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984)).

The plaintiffs unpersuasively argue that the phrase "color copper" is arbitrary, because a mere description of the copper would refer to it as "colored" or "colorful," rather than using "color" as an adjective. But a grammatically flawed description is still a description. A consumer who heard the phrase "color copper" would reasonably assume that it referred to copper that was, for some reason, not the ordinary color—and they would be correct. The name therefore is not fanciful or even suggestive; it describes and is therefore descriptive. Nevertheless, the plaintiffs have pleaded that they used the COLOR COPPER.COM mark for years, in a manner likely sufficient

to establish secondary meaning. The plaintiffs therefore have sufficiently pleaded that they have enforceable trademark rights.

The plaintiffs have also sufficiently pleaded that at least some of the defendants' materials infringed upon those rights. For example, this is the COLOR COPPER.COM mark, as it appeared on the http://www.colorcopper.com website:



And this is the logo used on the Subject Copper Website:



The similarities are not limited to the fact that only two letters separate COLOR from COLORED. Each logo uses descending font sizes for each word. Each logo puts the word "copper" in all caps. Each logo uses bright coloring for "Color" or "Colored," followed by a duller tone for "copper." Each logo uses that duller color as the color of ".com" as well. And each logo uses a pictorial design consisting of four squares in similar, although not identical, colors and patterns evocative of the underlying copper products; indeed, the defendants' logo of stacked squares looks somewhat like a person simply shuffled the plaintiffs' logo squares together. It is entirely plausible that an ordinary, unsophisticated consumer could be confused by these similarities.

The court stresses that the defendants' arguments, although not sufficient to warrant dismissal of the plaintiffs' claims, raise serious and real issues about the boundaries of the plaintiffs' rights that may well persist in this case. The plaintiffs have no authority to prevent any

competitor from using ordinary language to describe colorful copper. Nor do they have any right to prevent a competitor from adopting a non-confusing name or logo that, like theirs, evokes the features of multicolored copper products. There are, therefore, significant limits to what the plaintiffs can expect to prevent the defendants from doing. The court's holding therefore should not be construed to suggest that the plaintiffs are likely to establish rights that are nearly as broad as they seek. What matters for the purposes of Rule 12(b)(6), however, is whether the plaintiffs have plausibly alleged some trademark infringement, and they have done so. The court therefore will not dismiss those claims.

### 2. Trade Dress Infringement

"'Trade dress' refers to 'the image and overall appearance of a product,'" including "that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, intended to make the source of the product distinguishable from another and to promote its sale." *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1238–39 (6th Cir. 1991) (quoting *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 812 (5th Cir.1989); *Mr. Gasket Co. v. Travis*, N.E.2d 906, 912 n.13 (Ohio Ct. App. 1973)). "To establish liability for trade dress infringement, [a plaintiff] must show: 1) 'that the trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dress[es], 2) that the trade dress is primarily nonfunctional, and 3) that the trade dress of the competing good is confusingly similar.'" *FenF, LLC v. Shenzhen FromUfoot, Ltd.*, No. 16-12616, 2018 WL 3729073, at *2 (E.D. Mich. Aug. 6, 2018) (quoting *Abercrombie*, 280 F.3d at 629). The defendants argue that the plaintiffs have not sufficiently pleaded trade dress infringement because they have not identified the trade dress at issue with any specificity.

18

The phrase "trade dress" only appears in the First Amended Complaint about a dozen times, and the defendants are correct that the plaintiffs do not provide much detail, in those instances, regarding what "trade dress" they consider to be at issue, other than that they are referring generally to some aspect or aspects of their websites. (*See* Doc. No. 37 ¶¶ 75, 98, 100–05.) The website excerpts provide relatively little help. The Subject Epoxy website looks nothing whatsoever like the plaintiffs' epoxy website. The Subject Copper Website more closely resembles the plaintiffs' copper website, but most instances of resemblance arise out of the use of the allegedly copyright-protected photographs. While those uses may be illegal under copyright law, it is implausible that those photographs themselves are distinctive in the marketplace as signals of the origin of the underlying goods, and the First Amended Complaint provides no meaningful basis for reaching such a conclusion. The immediately apparent similarities between the copper websites therefore do not support a claim for trade dress infringement.

As the Sixth Circuit has recognized, the broad nature of the concept of trade dress makes it especially necessary for a plaintiff to provide a "precise expression of the character and scope" of what he is pleading as the basis for his claim. *Abercrombie*, 280 F.3d at 634 (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)). To that end, plaintiffs should, to the extent feasible, "separate[] out and identif[y] in a list" each of the "discrete elements which make up th[e] combination" of features that the plaintiffs seek to protect. *Id.* (quoting 1 McCarthy on Trademarks and Unfair Competition § 8:3). The plaintiffs have fallen far short of that standard, and it would be inappropriate for the court to dig further through the First Amended Complaint to try to assemble a potentially actionable claim, when none was pleaded. The court will therefore dismiss the plaintiffs' claims for trade dress infringement.

19

## 3. False Advertising

In addition to its trademark protections, the Lanham Act prohibits unfair competition through the use of misrepresentations of fact about one's own or another's goods, services, or business activities. *See* 15 U.S.C. § 1125(a). Section 1125(a)(1)(B) of the Act provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . .
>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). Based on that language, the Sixth Circuit has described the elements of a Lanham Act false advertising claim as:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually deceives or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 798 (6th Cir. 2015) (quoting *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999)).

The defendants argue that the court should dismiss the plaintiffs' false advertising claim because the First Amended Complaint does not actually identify any particular false or misleading statements upon which such a claim could be based.[10] In the plaintiffs' Response, they identify a

---

[10] The court notes that it has previously held that Lanham Act false advertising claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *Ciccio v. SmileDirectClub, LLC*, No. 3:19-CV-00845, 2020 WL 2850146, at *11 (M.D. Tenn. June 2, 2020). The court, however, also recognizes the usual rule that, "[i]f the failure to plead with particularity under Rule

number of paragraphs of the First Amended Complaint that, they assert, set forth the underlying false or misleading statements. (*See* Doc. No. 55 at 11 (citing Doc. No. 37 ¶¶ 35–36, 48, 87).) Those paragraphs, however, merely describe the supposed underlying trademark infringement. The plaintiffs also speculate that the Subject Epoxy website falsely represents details related to the epoxy being sold, but the First Amended Complaint does not include any such allegations. The plaintiffs therefore have not identified any basis for supporting a claim for false advertising that is not wholly redundant with their trademark infringement claims. The court, accordingly, will dismiss Count IV to the extent that it states an independent cause of action under a false advertising theory.

### 4. "Trade Name Infringement"

As the defendants point out, there is no separate Lanham Act cause of action for trade name infringement. Trade names can be trademarks—registered or unregistered—and, if they are, they are entitled to ordinary trademark protection. An entity's trade name may also be misused in any number of other ways, such as by appearing in a false advertisement or a fraudulent communication. But a "trade name" is not a distinct piece of intellectual property that can be "infringed" distinctly from its protectability as a trademark. In their Response, the plaintiffs focus on arguing that "trade name" is a distinct concept, but that is not disputed. In order to refute the defendants' argument, the plaintiffs needed to bridge the divide between distinct concept and distinct cause of action, which they have not. The court will accordingly dismiss the "trade name infringement" claims included in Count V.

---

9(b) is not raised in the first responsive pleading or in an early motion, the issue will be deemed waived." *Marathon Petroleum Co., LP v. Future Fuels of Am., LLC*, No. 10-14068, 2012 WL 1893506, at *2 (E.D. Mich. May 31, 2012). The defendants have not relied on Rule 9(b) in their arguments. The court therefore will apply only Rule 8's ordinary pleading requirements.

<u>5. False Designation of Origin</u>

As the defendants note, it is somewhat difficult to tell from the First Amended Complaint what the plaintiffs intend for their "false designation of origin" claims to entail. Unlike with the plaintiffs' trade name infringement claims, a false designation of origin is, in fact, a distinct basis for liability under the Lanham Act. *See* 15 U.S.C. § 1125(a). As a practical matter, though, the issue typically comes up only when the nature of a particular allegation is such that there may have been a false designation of origin distinct from simply infringing on another's trademark and creating confusion about a product's source. For example, false designation of origin may come up, distinctly from trademark infringement, when a seller has falsely attributed a product to a particular geographic location or particular artisan. Allegations of that sort, however, are not at issue in this case.

One might assume, then, that the plaintiffs are seeking to rely on "false designation of origin" as simply another label for trademark infringement. The First Amended Complaint, however, paints a more complicated picture. There, the plaintiffs describe the basis for this claim as follows:

> Mr. Stubenrauch and CV falsely designated themselves as the authors of the Infringing CV Website and the Infringing Epoxy Website, as well as the actual services offered on Plaintiffs' Websites. Thusly failing to properly designate Plaintiffs as the author and the source of the services being advertised on Plaintiffs' Websites is a material misrepresentation as to the origination of the Works embodied in the Infringing CV Website and the Infringing Epoxy Website which creates a likelihood of confusion that mistakenly causes the public to draw the conclusion that Mr. Stubenrauch and CV are the authors of the Works.

(Doc. No. 37 ¶ 108.) That language, in its discussion of "services," does appear to state a false designation of origin claim that is redundant with trademark infringement, and the court will not dismiss any such theory, redundant as it may be. However, the plaintiffs also characterize this claim as based on a false claim of authorship of the websites, which raises different issues.

22

As the defendants point out, the Supreme Court has definitively construed "false designation of origins," as it is used in the Lanham Act, to "refer[] to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003). Pursuant to that principle, a claim based on a false statement of authorship of a creative work—like a website—should be brought pursuant to copyright laws, not the Lanham Act. *Id.* Accordingly, any false designation of origin claim based on the websites must fail. The court accordingly will dismiss the claims for false designation of origin, without prejudice to the plaintiffs' reliance on any potentially overlapping arguments in support of their trademark infringement claims.

### 6. Tennessee Consumer Protection Act

The plaintiffs' pleading of their TCPA claims is also confusing. The plaintiffs mention the TCPA only in connection with Count VI, for false designation of origin. In the plaintiffs' briefing, however, they liken their TCPA claim to their infringement and unfair competition claims more generally, making it unclear why the statute appears where it does in the First Amended Complaint. The TCPA itself outlaws a strikingly lengthy list of practices—over fifty, *see* Tenn. Code Ann. § 47-18-104(b)(1)–(52)—so the First Amended Complaint's general citation to the statute provides relatively little guidance regarding what theory the plaintiffs expect to pursue. Nevertheless, the court will read the First Amended Complaint in the light most favorable to the plaintiffs and, in so doing, try to discern whether they have pleaded a claim under the state statute.

The TCPA provides a private right of action to "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or

deceptive act or practice described in [Tenn. Code Ann.] § 47-18-104(b) and declared to be unlawful by" the Act. Tenn. Code Ann. § 47-18-109(a)(1). "Person" is defined to include both natural persons and business entities. Tenn. Code Ann. § 47-18-103(14). The list of "unfair or deceptive acts or practices" prohibited by § 47-18-104(b) includes both broadly-worded general prohibitions and narrower, industry-specific prohibitions. Tenn. Code Ann. § 47-18-104(b)(1)–(52). Pursuant to those provisions, a plaintiff typically must prove two things to establish a claim under the TCPA: (1) that the defendant engaged in an act or practice that is among those prohibited by the Act; and (2) that the prohibited act or practice caused the plaintiff to suffer an ascertainable injury of the type covered by the Act. *Hanson v. J.C. Hobbs Co.*, No. W2011-02523-COA-R3CV, 2012 WL 5873582, at *9 (Tenn. Ct. App. Nov. 21, 2012) (quoting *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115–16 (Tenn. Ct. App. 2005)).

The First Amended Complaint identifies four practices prohibited by the TCPA that, the plaintiffs argue, describe actions taken by the defendants:

(1) Falsely passing off goods or services as those of another;

(2) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services. This subdivision (b)(2) does not prohibit the private labeling of goods and services;

(3) Causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another. This subdivision (b)(3) does not prohibit the private labeling of goods or services; [and] . . .

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have

Tenn. Code Ann. § 47-18-104(b). As those provisions suggest, the plaintiffs appear to be relying on the TCPA primarily as an alternative basis for liability for trademark infringement. As the court has already held, while the plaintiffs appear to be contemplating a broader set of rights than they

24

may be entitled to assert, the First Amended Complaint does, in fact, include some plausible claims of improper use of a trademark in a manner likely to cause consumer confusion, which is prohibited by the TCPA. If merely stating a trademark infringement claim were categorically sufficient to state a claim under the TCPA, then, the plaintiffs would have done so.

The defendants, however, argue that the court should dismiss the plaintiffs' TCPA claims because they have not sufficiently alleged that they suffered an ascertainable loss as a result of the alleged wrongful conduct. For the purposes of the TCPA, "[a]n ascertainable loss is a deprivation, detriment, or injury that is capable of being discovered, observed, or established." *Discover Bank v. Morgan*, 363 S.W.3d 479, 495 (Tenn. 2012) (citing *State v. New Beginning Credit Ass'n, Inc.*, No. M1999-00461-COA-R3CV, 2006 WL 1472284, at *8 (Tenn. Ct. App. May 25, 2006). Typically, the nature of the ascertainable loss on which a plaintiff wishes to rely in connection with a claim for unfair competition is relatively obvious, because the parties were in competition at the time of the underlying actions, and the defendant was allegedly siphoning off the plaintiff's business. According to the timeline of the First Amended Complaint, however, the parties were not in competition by the time the defendants took their allegedly improper actions. The plaintiffs were only ever in the colorful copper business because they were distributing the defendants' products in conjunction with the defendant, and they stopped doing so in connection with the Wasser situation—not the later alleged infringement. The plaintiffs, at least according to the story told in the First Amended Complaint, did not have an independent competing operation that could be harmed by the infringement in real time. No sale has gone to the defendants that could have gone to the plaintiffs.

It is possible that a plaintiff could nevertheless explain how, in such a situation, it has been ascertainably injured. These plaintiffs, however, have not done so. In their Response, they merely

direct the court to paragraphs including slight variations on the boilerplate claim that "Defendants' acts alleged herein were willful and deliberate and have harmed Plaintiffs in an amount to be determined at trial and such damage will increase unless Defendants are permanently enjoined from their wrongful actions." (Doc. No. 47 ¶¶ 83, 94, 104, 110.) That kind of conclusory language might be sufficient in a case in which the facts themselves make the nature of the underlying damages obvious. In this instance, however, more explanation was required.

It may be that the plaintiffs have viable claims based on the defendants' incursions on the plaintiffs' property-like trademark and copyright rights. To succeed under the TCPA however, simply establishing the invasion of a right is not enough. A plaintiff must plead actual, ascertainable harm. Because the plaintiffs failed to do so plausibly, the court will dismiss their TCPA claims.

**C. Common Law Claims**

1. Breach of Contract

"In a breach of contract action, [a plaintiff] must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (citing *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). The defendants argue that the plaintiffs' breach of contract claims should be dismissed because they have "failed to identify the contract [at issue] or how it was allegedly breached." (Doc. No. 47 at 10.)

With regard to whether the plaintiffs have sufficiently identified and alleged the existence of a contract, the defendants' argument is unavailing. The First Amended Complaint asserts that the parties had an "implied-in-fact contract confirmed by [the defendants'] course of conduct that lasted almost a decade." (Doc. No. 37 ¶ 70.) Tennessee law does, in fact, recognize that such a

26

contract can "arise under circumstances which, according to the ordinary course of dealing and common understanding . . . show a mutual intention to contract." *Metro. Gov't of Nashville & Davidson Cty. v. Cigna Healthcare of Tenn., Inc.*, 195 S.W.3d 28, 32 (Tenn. Ct. App. 2005) (quoting *Weatherly v. Am. Agric. Chem. Co.*, 65 S.W.2d 592, 598 (1933)). The plaintiffs have alleged that the parties, over a number of years of doing business, developed a shared understanding of their respective roles in the collaborative manufacturing, sales, and distribution relationship that they built. At least some aspects of that relationship plausibly reached the level of enforceability under the law of contract.

What the First Amended Complaint does not explain, however, is how any of the defendants' alleged wrongdoing amounted to an actual breach. The plaintiffs have not alleged that the defendants actually shortchanged them or failed to perform any duty that could reasonably be read into the distributorship relationship. Nor have the plaintiffs pleaded any basis for concluding that whatever contract arose included an exclusive grant of the right to sell the defendants' products. Even in the plaintiffs' Response, they offer little, if any, actual theory of breach, choosing instead to devote their briefing to the issue of whether a contract existed at all. But the mere existence of a contract does not transform everything that takes place between two parties into a contractual question. What the plaintiff describes is not a breach of contract, but rather a successful contractual relationship that ended and was followed by other wrongdoing cognizable through other causes of action. The court will accordingly dismiss the breach of contract claims.

2. Conversion

"Conversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights." *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012) (citing *Barger v. Webb*,

391 S.W.2d 664, 665 (Tenn. 1965); *Lance Prods., Inc. v. Commerce Union Bank*, 764 S.W.2d 207, 211 (Tenn. Ct. App. 1988)). As the requirement of "tangible" property would suggest, intangible property is "not subject to a claim for conversion." *Pomeroy v. McGinnis*, No. E2020-00960-COA-R3-CV, 2021 WL 3017199, at *6 (Tenn. Ct. App. July 16, 2021) (quoting *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012)). The defendants argue that the court should dismiss the conversion claim because all of the alleged property that they allegedly appropriated was intangible. The defendants are correct.

The First Amended Complaint describes the conversion alleged as involving the plaintiffs' copyright-protected works. (*See* Doc. No. 37 ¶ 112 ("Mr. Stubenrauch and CV stole photographs and text . . . ."). Tennessee, however, does not recognize conversion claims based on copyrights, *see Wells v. Chattanooga Bakery, Inc.*, 448 S.W.3d 381, 392 (Tenn. Ct. App. 2014), and the plaintiffs, in their Response, ultimately do not dispute either that conversion must be premised on tangible property or that copyrights are intangible. Rather, the plaintiffs attempt to recast their conversion claims as based on the alleged conversion of domain names, which, they argue, should be treated as tangible property.

That argument, though, fails for three reasons. First, of course, is that it is simply not what the plaintiffs pleaded. Although Count VII incorporates the full range of allegations that preceded it (as claims typically do), it is still explicitly a claim for conversion of rights to photographs, text, and other works. Second, even if the plaintiffs had attempted to state a claim for conversion of a domain name, they have not actually alleged that any such thing happened. Nothing in the First Amended Complaint suggests that the defendants actually took control over the plaintiffs' own domain name registrations, as opposed to merely using a similar, but different, URL. Finally, the

defendants' argument fails because they do not actually identify any convincing basis to conclude that Tennessee (or any other state's) law would reach the counterintuitive conclusion that a domain name is tangible property, despite the fact that it is, quite literally, not tangible. *See Xereas v. Heiss*, 933 F. Supp. 2d 1, 6 (D.D.C. 2013) (collecting cases stating that "domain names are generally considered intangible property"). The court will therefore dismiss the claims for conversion.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss First Amended Complaint (Doc. No. 46) will be granted in part and denied in part. The court will dismiss the plaintiffs' claims for trade dress infringement, false advertising, "trade name infringement," violation of the TCPA, breach of contract, and conversion.

An appropriate Order will enter.

ALETA A. TRAUGER
United States District Judge